14-152(L)
United States v. Rutigliano, Lesniewski, Baran

## UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: March 26, 2015     Decided: June 22, 2015)

Docket Nos. 14-152(L), 14-759, 14-1339

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

Appellee,

- v.-

JOSEPH RUTIGLIANO, PETER J. LESNIEWSKI,
MARIE BARAN,

Defendants-Appellants.[*]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Before:          JACOBS and CHIN, Circuit Judges, and WOLFORD,
                 District Judge.[**]

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

[**] The Honorable Elizabeth A. Wolford, of the United States District Court for the Western District of New York, sitting by designation.

Joseph Rutigliano, Peter J. Lesniewski, and Marie Baran appear from judgments of conviction entered, following a jury trial, in the United States District Court for the Southern District of New York (Marrero, J.). The defendants were convicted of (variously) conspiracy to commit mail fraud, wire fraud, and health care fraud, as well as substantive counts of these offenses, and one count of making false statements, for their roles in a decades-long scheme to defraud the United States Railroad Retirement Board into awarding fraudulent disability annuity payments to Long Island Railroad retirees.

We conclude that the government presented sufficient evidence as to venue, that defendants cannot succeed on a theory that venue was improperly manufactured, and that no "substantial contacts" inquiry is required where (as here) the defendants did not argue to the district court that prosecution in the Southern District of New York caused them hardship, prejudice, or otherwise undermined the fairness of their trial. Rutigliano argues that he was prosecuted outside the statute of limitations period. We apply the ordinary rule that the receipt of profits from an economically motivated conspiracy (here, disability pension payments) constitutes an overt act in furtherance thereof, and reject application to this case of the limited exception, articulated in United States v.

<u>Grimm</u>, 738 F.3d 498 (2d Cir. 2013). And, we reject defendants' challenges to the jury instructions, which we conclude were proper.

All of the other challenges raised by the defendants are considered and rejected in a summary order issued simultaneously with this opinion.

For the following reasons, and those stated in the summary order, we affirm the judgments of conviction.

> JOSEPH W. RYAN, JR., Melville, New York, <u>for Appellant Rutigliano</u>.
>
> JOHN D. CLINE, San Francisco, California, <u>for Appellant Lesniewski</u>.
>
> ANNE J. D'ELIA, Kew Gardens, New York, <u>for Appellant Baran</u>.
>
> DANIEL B. TEHRANI (<u>with</u> Nicole Friedlander and Michael A. Levy, <u>on the brief</u>), <u>for</u> Preet Bharara, United States Attorney for the Southern District of New York, <u>for Appellee</u>.

DENNIS JACOBS, <u>Circuit Judge</u>:

The Long Island Railroad ("LIRR") pension plan allows employees with 20 years or more of service to retire at age 50 with a pension equal to half of their pre-retirement income. Many LIRR employees doubled their pensions by

making false disability claims to the Railroad Retirement Board ("RRB") at the time of their planned retirement.

For their roles in criminally exploiting these overlapping benefits, defendants Joseph Rutigliano, a former LIRR conductor and president of the union local, Peter J. Lesniewski, an orthopedic physician, and Marie Baran, a former RRB employee, were convicted by a jury in the United States District Court for the Southern District of New York (Marrero, J.) of (variously) conspiracy to commit mail fraud, wire fraud, and health care fraud, as well as substantive counts of these offenses, and one count of making false statements.

On appeal, defendants raise a host of challenges. We hold that venue was proper, that defendants cannot succeed on a theory of manufactured venue, and that no "substantial contacts" inquiry is required where (as here) the defendants did not argue that prosecution in the Southern District of New York caused them hardship, prejudice, or otherwise undermined the fairness of their trial.

We reject Rutigliano's contention that he was prosecuted for conduct outside the statute of limitations period. We apply the ordinary rule that the receipt of profits from an economically motivated conspiracy (here, disability pension payments) constitutes an overt act in furtherance thereof, and reject the

4

argument that the limited exception articulated in United States v. Grimm, 738

F.3d 498 (2d Cir. 2013), applies in this case.

We conclude that the defendants' claims of error with respect to the jury

instructions given on the conspiracy charge, and on the meaning of "occupational

disability" are without merit.

All of the other challenges raised by the defendants are considered and

rejected in a summary order issued simultaneously with this opinion.

We affirm the judgments of conviction.


**BACKGROUND**

At trial, the government presented evidence that employees who were fit,

steady, and faultless in attendance schemed to create a "paper trail" for the onset

of disabilities at the hour they were ready to retire from employment by the

LIRR.  See, e.g., Trial Tr. at 168-72, 344, 375-76, United States v. Rutigliano, No.

11-cr-1091, (S.D.N.Y. 2013) ("Trial Tr.").  These employees, with the assistance of

Rutigliano and Baran, pre-planned their false claims of occupational disability by

visiting go-to doctors, like Lesniewski.

In addition to obtaining his own fraudulent disability benefits, Rutigliano helped other LIRR employees make false claims of disability, charging "around a thousand dollars" per application. Id. at 475, 486, 499. The jury heard testimony from cooperating witnesses who submitted false applications for disability benefits; one testified that it was "common knowledge and openly discussed that you could pay particular people, including . . . Rutigliano [] to complete the[] disability applications[,] filling them with lies." See, e.g., id. at 171, 325-26, 477, 680, 821, 943, 2647. Another witness testified that he paid Rutigliano $1,000 to complete his application because he knew Rutigliano would "say whatever needed to be said to get [him] the disability money that he wanted." Id. at 2647.

In providing these supposed "consulting" services, Rutigliano did not endeavor to find out if the applicants were actually disabled in any way. Id. at 498-99. Rather, he filled out the applications, often without consultation with the employee, with representations he knew to be requisite for obtaining a disability pension. Id. at 520. At trial, an auditor identified applications prepared by Rutigliano based on the use of the same boilerplate language to describe individual afflictions of many retirees. Id. at 1557-66, 1721-25.

6

Baran's husband, Gus--a former LIRR employee and unindicted coconspirator--obtained a fraudulent disability pension with the assistance of Lesniewski. Id. at 1292-94. Baran learned the ropes from her husband, and when she retired from the RRB, came to be known (like Rutigliano) as a "facilitator" of fraudulent disability benefit applications. Id. at 1113-14, 1594-1610. Baran filled out the fraudulent applications with little input from her clients; advised them on how to answer questions from the RRB; and gave them pointers on how to avoid suspicion by, for example, continuing to visit doctors after submitting their disability applications. Id. at 842-51, 1217-23. Baran, who testified in her own defense at trial, maintained that she filled out the disability applications in good faith, based on information provided by clients and their treating physicians. See id., e.g., at 2270-71. Baran's clients, however, testified that Baran filled out and submitted on their behalf fabricated applications for benefits that bore no resemblance to their physical conditions. Id. at 855-56, 1286.

As one of the go-to doctors, Lesniewski provided medical narratives to LIRR employees designed to convince the RRB that these employees had occupational disabilities--even though these employees were working at the time they consulted with Lesniewski (and Lesniewski never asked them whether they

were able to continue to perform their jobs).  Id. at 188-89, 192-93, 377-86.

Lesniewski submitted medical reports to the RRB recommending hundreds of

LIRR workers for fraudulent disability benefits, and charged $850 per narrative.

See id. at 52.

As to venue, Lesniewski and others submitted insurance claims (by wire)

to a health insurance company in the Southern District of New York for the

purpose of supporting fraudulent disability claims.  Clients of Rutigliano and

Baran visited doctors in the Southern District (and elsewhere) to support their

fraudulent applications.  And when the RRB requested re-certification of the

disabilities that ostensibly entitled the coconspirators to continuing benefits,

Rutigliano and other members of the conspiracy sent false assurances by mail to

the RRB at an address in the Southern District.

At trial, the defendants requested that the jury be instructed:

> To determine where venue lies you must consider in
> which district there were substantial contacts by the
> defendants to commit the alleged offenses charged.
> Substantial contacts takes into account a number of
> factors including the situs of the defendant's acts, the
> elements and nature of the crime, [and] the locus of the
> effect of the criminal conduct.

Gov't Supplemental App. at 21.  The district court declined to give the requested

charge, instead instructing that "the government must prove that some act in furtherance of the charge you are considering occurred in the Southern District of New York. . . . The government has satisfied its venue obligation if you conclude that it is more likely than not that any act in furtherance of the crimes charged in each count occurred in the Southern District of New York." Lesniewski App. at 796.

All three defendants were convicted of conspiracy to commit mail fraud, wire fraud, and health care fraud, and conspiracy to defraud the RRB. Rutigliano was convicted of multiple counts of substantive mail fraud and wire fraud, and one count of making false statements. Lesniewski and Baran were each convicted of the three substantive fraud counts.[1]

The defendants moved for judgments of acquittal on the ground that the government presented insufficient evidence to establish that venue was proper in the Southern District. Rutigliano also moved for a judgment of acquittal (with the exception of a few counts) on the ground that the government failed to prove that the conduct for which he was charged occurred within the statute-of-

---

[1] The district court sentenced Rutigliano principally to 96 months' imprisonment, Lesniewski principally to 96 months' imprisonment, and Baran principally to 60 months' imprisonment.

9

limitations.[2] See Mot. for Acquittal, Dkt. No. 487, Rutigliano, 11-cr-1091. The district court denied the motions. This appeal followed.

## DISCUSSION

Defendants argue that the government failed to prove proper venue, or improperly manufactured it, and that the district court erred by failing to instruct the jury that venue could only be established if the government proffered evidence of the defendants' "substantial contacts" with the jurisdiction. Rutigliano also contends that his conviction (except with respect to the substantive mail fraud and false statements counts) cannot stand because his prosecution was barred by the statute of limitations. The defendants also challenge the court's instructions to the jury on the conspiracy charge, and on the meaning of "occupational disability."

## I

"Both the Sixth Amendment and Fed. R. Crim. P. 18 require that a defendant be tried in the district where his crime was committed." United States

---

[2] Rutigliano made no statute of limitations argument with respect to one count of mail fraud, one count of wire fraud, and one count of making a false statement.

v. Tzolov, 642 F.3d 314, 318 (2d Cir. 2011) (internal quotation marks omitted).

"When a federal statute defining an offense does not specify how to determine where the crime was committed," we look to the "nature of the crime alleged and the location of the act or acts constituting it." Id. (internal quotation marks omitted).

For an offense deemed to be "continuing," venue may be proper in more than one location. See United States v. Kim, 246 F.3d 186, 191 (2d Cir. 2001) (explaining that venue in a continuing offense is "proper in any district in which the offense began, continued, or concluded"). A conspiracy is a continuing offense in which "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004) (internal quotation marks omitted).

"Any offense involving the use of the mails . . . is a continuing offense and . . . may be inquired of and prosecuted in any district from, through, or into which such . . . mail matter . . . moves." 18 U.S.C. § 3237(a). Wire fraud is likewise a continuing offense. See Kim, 246 F.3d at 191. Although we have not

11

previously considered the question, we now hold that a scheme to violate the health care fraud statute is a continuing offense.[3]  See 18 U.S.C. § 1347(a) (criminalizing the knowing or willful execution or attempt to execute a "scheme or artifice" to "defraud any health care benefit program" or "obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program"); see also United States v. Mermelstein, 487 F. Supp. 2d 242, 250 (E.D.N.Y. 2007) ("A scheme proscribed by Section 1347 may properly be charged as a continuing offense." (citing cases)).  The health care fraud scheme "was committed in all of the places that any part of it took place, and venue . . . was appropriate in any of them."  United States v. Rodriguez-Moreno, 526 U.S. 275, 282 (1999).

The government bears the burden of proving that venue is proper as to each count.  United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989).  But because venue is not an element of the offense, "the government

---

[3] Significantly, we have previously held that a scheme to violate the bank fraud statute, 18 U.S.C. § 1344, constitutes a continuing offense and that statute is substantially similar to § 1347.  See United States v. Magassouba, 619 F.3d 202, 207 (2d Cir. 2010) (observing that it is "well established that bank fraud is a continuing offense").

need establish it only by a preponderance of the evidence." United States v.

Ramirez, 420 F.3d 134, 139 (2d Cir. 2005).

**A**

In challenging the sufficiency of the government's venue evidence,

defendants "bear[] a heavy burden, because the reviewing court is required to

draw all permissible inferences in favor of the government." United States v.

Kozeny, 667 F.3d 122, 139 (2d Cir. 2011).

**1**

As to the mail fraud conspiracy and substantive mail fraud counts, the

government adduced evidence that conspirators, including Rutigliano,

responded to an inquiry from the RRB by mailing false disability re-certification

forms to an RRB address in the Southern District of New York.  The

coconspirators did so in order to perpetuate their fraud, and thereby secure

continued receipt of the disability benefits that were the object of the scheme.  See

Trial Tr. at 991.  Accordingly, the "acts constituting the [mail fraud] crime"

clearly "implicate" the Southern District, rendering venue there proper.  United

States v. Magassouba, 619 F.3d 202, 205 (2d Cir. 2010).

13

Defendants argue that the re-certification mailings took place after the conspiracy and mail fraud scheme were over, and thus were not in furtherance of the crimes. We disagree. These re-certifications were sent in order to ensure continued benefits and to prevent the RRB from discovering the ongoing fraud. See United States v. Lane, 474 U.S. 438, 451-52 (1986) ("Mailings occurring after the receipt of the goods obtained by fraud are within the statute if they were designed to lull the victim[] into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." (internal quotation marks omitted)); see also United States v. Tocco, 135 F.3d 116, 125 (2d Cir. 1998) ("Mailings related to an insurance investigation that are a part of the customary steps taken by an insurance carrier to decide whether to pay a claim under a policy . . . are in furtherance of the fraudulent scheme . . . . A rational jury could conclude that these mailing involved routine requests for information needed to advance the insurer's normal claim processing and therefore furthered the scheme.").

Lesniewski and Baran contend that, as relevant to them, the re-certifications were not part of the mail fraud or the conspiracy to commit that

14

crime, because they were not directly responsible for the completion and mailing of the re-certification forms.  But, as we have repeatedly held, mail fraud schemes do not require a defendant to know about the specific mailing.  Rather, "it need only be shown that [the defendant] acted with knowledge that the use of the mails will follow in the ordinary course of business, or that such use can reasonably be foreseen, even though not actually intended."  Tocco, 135 F.3d at 124 (internal quotation marks omitted).

The government presented sufficient evidence for a jury to conclude that Lesniewski understood and contemplated that his patients would send paperwork to the RRB to establish and maintain their benefits for their alleged disabilities.  Lesniewski himself completed periodic "sickness benefit" forms for his patients to enable them to receive additional fraudulent benefits, and completed additional periodic forms to submit to private insurers to obtain unwarranted benefits.  It was likewise clear to Baran, as a former RRB employee, that the scheme would entail mailing to the RRB forms reporting the conspirators' fitness.  And for purposes of the conspiracy, venue may be grounded in any act performed by any conspirator undertaken to further the object of the conspiracy.  See Tzolov, 642 F.3d at 319-20.

15

As to the wire fraud convictions, the government proved that unlawfully obtained disability benefits, wired to participants in the scheme, traveled through or over waters within the Eastern District, which are statutorily defined to also be part of the Southern District.  See 28 U.S.C. § 112(b), (c); United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir. 1987) (concluding flight over "body of water that lies within the joint jurisdiction of the Southern and Eastern Districts of New York . . . was sufficient to make venue in the Southern District proper").

Defendants concede that venue lies where a wire in furtherance of a scheme begins its course, continues or ends.  See United States v. Gilboe, 684 F.2d 235, 239 (2d Cir. 1982) ("[T]he proceeds of the fraud were all transferred through New York so that such commerce moved from, through, or into the Southern District of New York.  Therefore, venue was proper in that district." (internal quotation marks omitted)).  Their contention is that the wiring of benefits was not in furtherance of the conspiracy, but rather occurred after the object of the scheme had been accomplished.

However, "a scheme to defraud is not complete until the proceeds have been received."  United States v. Vilar, 729 F.3d 62, 95 (2d Cir. 2013) (internal

16

alteration and quotation marks omitted); see United States v. Mennuti, 679 F.2d

1032, 1035 (2d Cir. 1982) ("[A] conspiracy continues until the conspirators receive

their anticipated economic benefits."). This doctrine has its limits, but at least the

first wiring (and many more) must be deemed in furtherance of the conspiracy.

For venue purposes, it therefore matters that the fraudulently obtained disability

annuity payments were wired through the Southern District.[4]

**3**

Also sufficient was the evidence establishing that venue was proper for the

health care fraud charges. The defendants themselves may not have been

physically present in the Southern District of New York, but their presence is

unnecessary for proper venue. See United States v. Rommy, 506 F.3d 108, 120 (2d

Cir. 2007).

---

[4] Although wirings through the Southern District in fact took place during the relevant statue of limitations, the government was not required to so prove for purposes of establishing that venue was proper. See United States v. Tannenbaum, 934 F.2d 8, 13 (2d Cir. 1991) ("Although the government must prove that each *crime* has been timely prosecuted in the proper district, we discern no valid reason to burden the government with proving that the *overt act* establishing proper venue also must have been committed within the statute of limitations."). This is so because "[r]ules governing venue and limitations serve distinct purposes." Id. Statutes of limitations "*limit exposure* to criminal prosecution to a certain fixed period of time" while the rules governing venue limit prosecution to certain jurisdictions. Id. (internal quotation marks omitted).

Lesniewski submitted insurance claims to a health insurance company (and received payments) in connection with medical visits and procedures undertaken for no reason other than to deceive the RRB. These payments were made by wire, and traveled through the waters over which the Southern and Eastern Districts share jurisdiction. The submission of fraudulent health care reimbursement claims lies at the core of conduct criminalized by § 1347.

Clients of Rutigliano and of Baran visited doctors in the Southern District, and at least one cooperating witness bolstered his fraudulent claim by visiting a medical practice that sent bills for the unnecessary procedures from its office in the Southern District. Rutigliano and Baran's clients then listed these visits on their disability applications. We therefore conclude that the government presented sufficient evidence that the "acts constituting" the substantive health care fraud crime, and the conspiracy to commit that crime, implicated the Southern, as well as the Eastern, Districts. United States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985).

**B**

Defendants did not argue manufactured venue below, and cannot succeed on plain error review. See Rommy, 506 F.3d at 127 ("[T]his court has never

18

vacated a conviction on the basis of manufactured venue."). In arguing manufactured venue, defendants implicitly concede that their acts extended into the Southern District while arguing in effect that the Court should disregard these acts because the government induced them to be made in the Southern District.

Other circuit courts have explicitly rejected the manufactured venue doctrine and concluded that a defendant's "interests are fully protected by Fed. R. Crim. P. 21(b)." United States v. Rodriguez-Rodriguez, 453 F.3d 458, 462 (7th Cir. 2006) ("The entrapment doctrine protects the defendant against manufactured offenses . . . it does not limit venue."); see also United States v. Al-Talib, 55 F.3d 923, 929 (4th Cir. 1995) ("There is no such thing as 'manufactured venue' or 'venue entrapment.'"). We have, however, previously recognized the possibility that, under certain circumstances, venue manipulation might be improper. See United States v. Myers, 692 F.2d 823, 847 n.21 (2d Cir. 1982) (observing that venue might not be proper where the prosecution "lures a defendant to a distant district for some minor event simply to establish venue" in a preferred jurisdiction).

19

"Venue in federal criminal cases is controlled by a complicated interplay of constitutional provisions, statutes, and rules." United States v. Rowe, 414 F.3d 271, 277 (2d Cir. 2005) (internal alteration and quotation marks omitted). Even if, in our Circuit, the manufactured venue doctrine provides an additional safeguard against "bias and inconvenience," id., in a prosecution of a continuing offense, "[t]he concern over a distant district is critical, as the provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." United States v. Spriggs, 102 F.3d 1245, 1251 (D.C. Cir. 1996) (alterations and internal quotation marks omitted); see also United States v. Cabrales, 524 U.S. 1, 6 (1998) (observing our Nation's founders' "complaints against the King of Great Britain, listed in the Declaration of Independence, included his transportation of colonists 'beyond Seas to be tried'").

Here, the record suggests that the coconspirators sent disability re-certification mailings into the Southern District in order to ensure that they continued to receive fraudulent benefits; they were not lured to a faraway land. Trial Tr. at 991; see also Spriggs, 102 F.3d at 1245 ("[O]bviously there is nothing distant about the District vis-a-vis its Maryland and Virginia suburbs."). And

20

there is no basis to conclude that the government preferred to try these defendants in the Southern District (instead of the Eastern District), or that any unfair advantage was obtained, or that the "convenience of the parties" or the "interest[s] of justice" was subverted by prosecution. Fed. R. Crim. P. 21(b).

Accordingly, even if the re-certification mailings were sent to the Southern District at the government's initiative, defendants cannot sustain their burden of showing error, much less plain error. See Rommy, 506 F.3d at 127; see also United States v. Bastian, 770 F.3d 212, 220 (2d Cir. 2014) ("We typically do not find plain error where the operative legal question is unsettled." (internal quotation marks omitted)).

## C

Defendants argue that, even if the continuing offenses for which they were convicted occurred in the Southern District of New York, venue is nevertheless improper because their conduct did not have "substantial contacts" with the Southern District. True, "[o]n occasion we have supplemented our venue inquiry with a 'substantial contacts' test that takes into account a number of factors," including the "site of the defendant's acts" and "the locus of the effect of the criminal conduct." United States v. Coplan, 703 F.3d 46, 80 (2d Cir. 2012) (some

21

internal quotation marks omitted).  As we have recently explained, however, that inquiry is made only if "the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial."  Id. (internal quotation marks and alterations omitted).  Otherwise, prosecution for a continuing offense, "committed in more than one district," may occur "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a); see United States v. Johnson, 323 U.S. 273, 275 (1944) (recognizing that "Congress may, to be sure, provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates").

Here, "we need not be concerned about jeopardizing the values underlying the substantial contacts tests because [the defendants cannot] argue that being prosecuted in the Southern District imposed an additional hardship on [them], prejudiced [them], or undermined the fairness of [their] trial."  Ramirez, 420 F.3d at 143 (internal quotation marks omitted).  Accordingly, we identify no error in the district court's ruling declining to give the "substantial contacts" jury instruction requested by the defendants.

## II

Rutigliano argues that his prosecution (other than with respect to one count of mail fraud, one count of wire fraud, and the false statements offense) was barred by the statute of limitations because the government failed to prove that he, or one of his coconspirators, committed an overt act in furtherance of the conspiracy within the limitations period.[5]

We review de novo a legal challenge to whether an ongoing conspiracy extended into the limitations period and to whether conduct constitutes an overt act in furtherance of the conspiracy, see United States v. LaSpina, 299 F.3d 165, 173-74 (2d Cir. 2002); but a factual sufficiency challenge is reviewed in the light most favorable to the prosecution, see United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998). We will affirm the jury's guilty verdict if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." United States v. Desnoyers, 637 F.3d 105, 109 (2d Cir. 2011).

---

[5] The original indictment was returned on December 19, 2011 and the statute of limitations for all offenses of which Rutigliano was convicted is five years. See 18 U.S.C. § 3282 ("Except as otherwise provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed).

23

Rutigliano invokes United States v. Grimm, 738 F.3d 498 (2d Cir. 2013), to argue that his passive receipt of fraudulently obtained disability pension payments during the limitations period is insufficient to support prosecution. The narrow exception articulated in Grimm, however, has no applicability here.

The conspiracy in Grimm was to manipulate the interest rate set in a specific type of municipal investment contract that, by regulation, was supposed to be set by competitive bidding. We held that interest payments made by wire over an indefinite and prolonged period eventually ceased to be overt acts in furtherance of a conspiracy. Id. at 499. The Court thus recognized an exception to the ordinary rule set out in United States v. Salmonese, 352 F.3d 608 (2d Cir. 2003), that a conspirator's receipt of anticipated benefits within the limitations period can, by itself, constitute an overt act in furtherance of an ongoing conspiracy. Id. at 617.

Consistent with precedent in and outside this Circuit, Grimm explained that "a conspiracy ends notwithstanding the receipt of anticipated profits where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place."

24

738 F.3d at 502 (internal quotation marks and alterations omitted).

No exception to Salmonese is justified here. Rutigliano and his coconspirators engaged, within the limitations period, in "measures of concealment" and "other corrupt intervention." Id. at 503. Thus, Rutigliano and his coconspirators mailed false disability re-certification forms to the RRB in order to secure continued payments; cooperating witnesses testified that they filled out the re-certification form because it was "required to continue to get your railroad disability," Trial Tr. at 991; and evidence at trial sufficiently demonstrated that the coconspirators were aware of their continuing duty to keep the RRB apprised as to their ability to work and physical condition, id. at 1360. All former railroad employees receiving RRB disability payments received a yearly notice setting forth their obligation to inform the RRB of any improvement in their physical condition.

In light of the continuing duty to re-certify eligibility, the receipt of the disability pension payments cannot be viewed as merely the "result" of a completed conspiracy. Grimm, 738 F.3d at 503. In any event, conduct arguably constituting additional overt acts were committed within the limitations period:

- Certain of Rutigliano's clients first applied for fraudulent disability pension benefits in 2007;

- Lesniewski continued to see patients and signed false medical narratives through at least 2008;

- Baran did not even begin providing her services as a "facilitator" until 2008; and

- Cooperating coconspirators testified about visits to doctors complicit in the fraud within the limitations period.

Finally, Rutigliano's concealment from the RRB that he was working (albeit as a disability-fraud "consultant") is a "deliberate omission" sufficient to "constitute an overt act for purposes of the statute of limitations." United States v. Ben Zvi, 242 F.3d 89, 97 (2d Cir. 2001).

Accordingly, the features of the ordinary, noncriminal payments in Grimm are not present here and the conspirators' receipt of disability benefits are properly viewed as conduct in furtherance of the conspiracy that occurred within the limitations period.

\* \* \*

26

Although Rutigliano premises his statute-of-limitations challenge on Grimm--which concerned only the boundaries of when a series of payments can constitute overt acts in furtherance of a conspiracy for statute of limitations purposes--he summarily argues that the substantive counts of conviction (except one mail fraud count and the false statement count relating to his submission of the re-certification form) should also be dismissed. We reject this argument because each of the substantive offenses was based on a mailing or wire within the applicable limitations period. See, e.g., United States v. Eisen, 974 F.2d 246, 263 (2d Cir. 1992) ("[T]he statute of limitations in a mail fraud case runs from the date of the charged mailing.").

## III

Defendants challenge the district court's instructions to the jury on the conspiracy charge and on the meaning of "occupational disability." When a defendant makes a sufficient objection below, "[w]e review challenged instructions de novo but will reverse only if all the instructions, taken as a whole, caused a defendant prejudice." United States v. Applins, 637 F.3d 59, 72 (2d Cir. 2011) (internal quotation marks omitted). "The defendant bears the burden of showing that the requested instruction accurately represented the law in every

27

respect and that, viewing as a whole the charge actually given, he was prejudiced." Id. (internal alterations and quotation marks omitted). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Id. (internal quotation marks omitted).

## A

At the charging conference, Lesniewski asked the court not to instruct the jury that "it is rare that a conspiracy can be proven by direct evidence of an explicit agreement." Trial Tr. at 2605. Lesniewski conceded that this statement "may be true," but argued that the instruction was "almost like marshaling the evidence in a certain way." Id. The court rejected this request. The court did, however, grant Lesniewski's request that it change the word "often" to "sometimes" in the sentence: "Sometimes, the only evidence that is available with respect to the existence of a conspiracy is that of disconnected acts on the part of the alleged individual conspirators." Id. at 2606.

Lesniewski's challenge fails because the instructions were not erroneous. Cf. United States v. Kopstein, 759 F.3d 168, 172 (2d Cir. 2014) ("Instructions are erroneous if they mislead the jury as to the correct legal standard or do not

28

adequately inform the jury of the law." (internal quotation marks omitted)). A "jury's verdict may be based entirely on circumstantial evidence." United States v. Goffer, 721 F.3d 113, 124 (2d Cir. 2013). And it is true that "the conspiratorial agreement . . . may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." United States v. Santos, 541 F.3d 63, 71 (2d Cir. 2008).

**B**

Explaining that it did not want to go "beyond the [regulatory] definitions," Trial Tr. at 2860, of "occupational disability," the district court denied Rutigliano's request to tell the jury that the RRB defined "occupational disability" in various ways less onerous than as set forth in the governing regulation. See 20 C.F.R. §§ 220.10, 220.13; see also Trial Tr. at 2959. Rutigliano asserts that the court's "occupational disability" charge gave insufficient guidance, and improperly allowed the jury to conclude that a retiree had to be incapacitated in order to qualify for benefits. Rutigliano's challenge to this instruction is without merit. He cannot demonstrate that his requested charge "accurately represented the law in every respect." Applins, 637 F.3d at 72. And, in any event, the "occupational disability" instruction given was not erroneous.

29

In his closing argument, Rutigliano's counsel argued that an occupational disability could mean as little as "[w]e don't want you on the train if you are not a hundred percent." Rutigliano App. at 346. The point defense counsel sought to make through the requested instruction and his closing argument, if true, is that the fraudulent disability pension applications did not actually deceive the RRB, or that the RRB was compliant, or complicit, or tacitly in on the conspiracy.

Fraud at the LIRR was epidemic; the evidence showed that a whopping 79 percent of LIRR employees retired on disability; this number contrasts with 21 percent for employees of Metro-North, a commuter railroad comparable to the LIRR except with respect to its retirement plan. Trial Tr. at 1039. It is therefore remarkable, as the defendants argued, that these percentages raised no red flags for the members of the RRB. However, this is no defense to the defendants' fraud. If the RRB members were stupefied, then they were defrauded; if they were complicit (or coconspirators), that would have been a ground for prosecution, not a defense.

## CONCLUSION

For the foregoing reasons, and those set forth in the summary order, we affirm the judgments of conviction.

30